[Cite as *Frenchko v. Shook*, 2024-Ohio-3153.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

| | |
|---|---|
| NIKI (MICHELE NICOLE) FRENCHKO, | CASE NO. 2024-T-0003 |
| Petitioner-Appellant, | |
| - vs - | Civil Appeal from the Court of Common Pleas |
| SHAWN SHOOK, | |
| Respondent-Appellee. | Trial Court No. 2023 CV 01699 |

# O P I N I O N

Decided: August 19, 2024
Judgment: Affirmed

*Kenneth D. Myers,* 6100 Oak Tree Boulevard, Suite 200, Cleveland, OH 44131 (For Appellant).

*Shawn Shook*, 201 Reo Boulevard, N.W., Warren, OH 44483 (Appellee).

EUGENE A. LUCCI, P.J.

{¶1} Appellant, Niki (Michele Nicole) Frenchko appeals the judgment denying her petition for a Civil Stalking Protection Order ("CSPO") following a full hearing. We affirm.

{¶2} On November 14, 2023, Frenchko, a Trumbull County Commissioner, filed a petition requesting the trial court to issue a CSPO against appellee, Shawn Shook, a resident of Warren Township in Trumbull County, Ohio, who frequently attends the commissioners' meetings. The court ordered an ex parte CSPO on November 16, 2023, and set the matter for a full hearing.

**{¶3}** Following the full hearing, in a judgment issued on November 30, 2023, the trial court found that Frenchko failed to demonstrate by a preponderance of the evidence that Shook committed a violation of R.C. 2903.211, the statute prohibiting menacing by stalking. Accordingly, the trial court denied Frenchko's request for a CSPO and vacated the ex parte CSPO.

**{¶4}** In her sole assigned error, Frenchko argues:

**{¶5}** "The trial court erred by declining to grant the CSPO."

**{¶6}** Frenchko sought a CSPO pursuant to R.C. 2903.214, which, as relevant here, permits a person to seek a protection order against an adult respondent by filing a petition containing an allegation that the respondent engaged in the offense of menacing by stalking against the petitioner, including the nature and extent of the offense. R.C. 2903.214(C)(1). At a full hearing on the petition for a CSPO, the petitioner bears the burden of demonstrating, "by a preponderance of the evidence, that he or she is entitled to a CSPO." *Moyer v. Robinson*, 2023-Ohio-764, ¶ 28 (11th Dist.), citing *Cooper v. Manta*, 2012-Ohio-867, ¶ 30 (11th Dist.).

**{¶7}** Menacing by stalking is proscribed by R.C. 2903.211, which provides:

(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person. In addition to any other basis for the other person's belief that the offender will cause physical harm to the other person or the other person's family or household member or mental distress to the other person or the other person's family or household member, the other person's belief or mental distress may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.

2

(2) No person, through the use of any form of written communication or any electronic method of remotely transferring information, including, but not limited to, any computer, computer network, computer program, computer system, or telecommunication device shall post a message or use any intentionally written or verbal graphic gesture with purpose to do either of the following:

(a) Violate division (A)(1) of this section;

(b) Urge or incite another to commit a violation of division (A)(1) of this section.

{¶8} For purposes of the menacing by stalking statute:

(1) "Pattern of conduct" means two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents, or two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents, directed at one or more persons employed by or belonging to the same corporation, association, or other organization. Actions or incidents that prevent, obstruct, or delay the performance by a public official, . . . of any authorized act within the public official's . . . official capacity, or the posting of messages, use of intentionally written or verbal graphic gestures, or receipt of information or data through the use of any form of written communication or an electronic method of remotely transferring information, including, but not limited to, a computer, computer network, computer program, computer system, or telecommunications device, may constitute a "pattern of conduct."

. . .

(7) "Post a message" means transferring, sending, posting, publishing, disseminating, or otherwise communicating, or attempting to transfer, send, post, publish, disseminate, or otherwise communicate, any message or information, whether truthful or untruthful, about an individual, and whether done under one's own name, under the name of another, or while impersonating another.

R.C. 2903.211(D).

3

Case No. 2024-T-0003

{¶9} With respect to the statute's requirement that the belief of physical harm or mental distress be "knowingly" caused, R.C. 2901.22(B) provides:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

*See also State v. Simpson*, 2024-Ohio-2865, ¶ 76 (11th Dist.), quoting *State v. Bone*, 2006-Ohio-3809, ¶ 33 (10th Dist.) ("'Sufficient evidence supports the "knowingly" element of menacing by stalking if the evidence allows the trier of fact to reasonably conclude that the defendant was aware that his conduct would probably cause the victim to believe that the defendant will cause physical harm or mental distress to the victim.'").

{¶10} With respect to the element of the offense requiring a belief that the respondent will cause physical harm or mental distress, "[m]ental distress" means any of the following:

> (a) Any mental illness or condition that involves some temporary substantial incapacity;
>
> (b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

R.C. 2903.211(D)(2).

{¶11} This court has held that actual mental distress need not be proven to demonstrate a violation of R.C. 2903.211 as an alternative to demonstrating physical

4

harm or the threat of physical harm. *Ziegler v. Tameris*, 2022-Ohio-4044, ¶ 11 (11th Dist.).
*See R.G. v. R.M.*, 2017-Ohio-8918, ¶ 12-15 (7th Dist.) (discussing split in the appellate districts as to whether the phrase "cause another person to believe the offender will" as used in R.C. 2901.211 applies only to the phrase "cause physical harm" or also applies to the phrase "cause mental distress"). *See also Z.J. v. R.M.*, 2024-Ohio-1507 (determining that a conflict exists between the appellate districts, and ordering briefing, on the following issue: "Whether R.C. 2903.211 (A)(1) requires a victim to actually experience mental distress or only believe that the stalker will cause the victim physical harm or mental distress, for a court to issue a civil stalking protection order."). Instead, "[a] petitioner only has to show that the respondent knowingly committed certain acts, and that from those actions, she *believed* the respondent was going to cause her mental distress." (Emphasis in original.) (Citations omitted.) *Ziegler* at ¶ 11.

{¶12} Here, in her appellant's brief, Frenchko maintains that she presented sufficient evidence to support the issuance of a CSPO, and she supplies the standard of review applicable to the sufficiency of the evidence. However, the sufficiency of the evidence and the weight of the evidence are distinct concepts. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 9. Because the trial court determined that Frenchko failed to meet her burden of persuasion, i.e., by a preponderance of the evidence, our review of the evidence pertains to its weight. *See id.* at ¶ 19. The "[w]eight of the evidence concerns 'the inclination of the *greater amount of credible evidence* . . . to support one side of the issue rather than the other.'" (Emphasis added in *Thompkins*.) *State v. Thompkins*, 1997-Ohio-52, 387, quoting *Black's Law Dictionary* (6th Ed. 1990). When considering challenges to the weight of the evidence, an appellate court reviews "'the entire record,

5

weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Although Frenchko has not specifically directed her challenges to the weight of the evidence, we have reviewed the record in accordance with this standard.

**{¶13}** However, we preliminarily note two issues significant to our review of the evidence. First, a portion of Frenchko's testimony pertained to a group that sought to remove her from office. Frenchko maintained that Shook was part of this group but provided no evidence demonstrating that Shook performed any of the activities that she attributed to this group. Shook testified that he had not been a part of this group for several years; although he admitted commenting on some of this group's Facebook posts and being part of a different group that sought to remove Frenchko from office. In its findings of fact and conclusions of law issued contemporaneously with its judgment, the trial court noted that the group's Facebook posts at issue were posted anonymously, and the court did not appear to attribute any of the group's actions to Shook. Frenchko does not develop an argument on appeal that Shook bore responsibility for the actions or posts that she ascribed to the group. Accordingly, this court will not assign the purported conduct of the group to Shook.

**{¶14}** Second, a portion of Frenchko's evidence pertained to Shook's mental health in 2014, a CSPO protecting Shook's mother that had been issued against him that had expired during or prior to 2019, and information related to Shook's past conduct

6

toward a Warren Township Trustee during or at some unspecified point after 2019. In its findings of fact and conclusions of law, the court did not specifically address the testimony and evidence that pertained to Shook's mental health history and his past conduct with respect to the trustee, aside from questioning the credibility of Shook's mother, who also testified on these issues. With respect to the prior CSPO issued in favor of Shook's mother, to which she also testified, the court found this evidence to be entirely unrelated to the present action.

{¶15} Nonetheless, Frenchko maintains in her appellant's brief that the trial court should have given great weight to the evidence of Shook's prior mental health issues, the expired CSPO, and Shook's behavior toward the trustee. However, as discussed above, Frenchko bore the burden of proving the following elements as applied to this case: that Shook (1) engaged in a pattern of conduct, i.e. two or more actions closely related in time, (2) by which he knowingly caused (3) Frenchko to believe that he would cause physical harm to her or her family or household or cause mental distress to her or her family or household. *See* 2903.211.

{¶16} Frenchko's knowledge of Shook's history or prior conduct may have been relevant to Frenchko's subjective belief under the third element of the offense as numbered above. *See State v. Braun*, 2018-Ohio-3628, ¶ 32 (11th Dist.) (plurality) (evidence of victim's knowledge of defendant's violence toward another was relevant as to victim's "belief" defendant would harm victim). Frenchko maintains in her appellant's brief that there was "ample testimony about [Frenchko's] fears and what she did to protect herself from [Shook]." This evidence also pertains to her subjective fear of Shook under the third element of the offense. However, the trial court's findings of fact and conclusions

7

Case No. 2024-T-0003

of law appear to take issue with the weight of the evidence as to the first and second elements of menacing by stalking.

{¶17} With respect to the first two elements of menacing by stalking, Frenchko does not explain in what manner the evidence of Shook's history pertained to establishing a pattern of conduct or knowing causation. Frenchko does not advance an argument that Shook's conduct underlying the prior protection order, his mental health, or his conduct with the trustee constituted part of the "pattern of conduct." Nor can this court discern how Shook's history, which did not involve Frenchko, would provide context to the conduct at issue here so as to make it more or less likely that Shook would have knowledge that his conduct would cause Frenchko a belief of physical harm or mental distress. *Compare State v. Spaulding*, 2016-Ohio-8126, ¶ 114 (defendant's past domestic *violence toward victim* was relevant to prove both a pattern of conduct and also that he knew that his conduct would cause victim to believe that he was going to harm her); *State v. Bilder*, 99 Ohio App.3d 653, 658 (9th Dist. 1994) ("Other acts evidence can be particularly useful in prosecutions for menacing by stalking because it can assist the jury in understanding that a defendant's otherwise innocent appearing acts, *when put into the context of previous contacts he has had with the victim,* may be knowing attempts to cause mental distress." (Emphasis added.)); *Frenchko v. Frenchko-Nagy*, 2015-Ohio-4546, ¶ 34 (11th Dist.) (testimony regarding call made by the respondent's boyfriend at the respondent's request *to the petitioner* in 2008 provided context for evaluating testimony regarding similar call the respondent's acquaintance made to the petitioner in 2012).

{¶18} Therefore, because the trial court's decision did not focus on Frenchko's subjective belief of fear of harm or mental distress, to which her knowledge of Shook's

8

history may have been relevant, we will focus our discussion on the remaining elements of menacing by stalking. In so proceeding, for the reasons addressed above, we do not consider Shook's history that did not pertain to Frenchko as part of the "pattern of conduct."

{¶19} At the full hearing, Frenchko presented evidence of Shook's conduct that occurred in the latter half of 2023. Frenchko provided evidence pertaining to Shook's behavior and comments at commissioners' meetings and other events during this time period. Frenchko introduced into evidence video of portions of the commissioner's meetings at which Shook made comments after the public was invited to speak on matters "for the good of Trumbull County." In his comments, Shook questioned Frenchko as to her mental health; maintained that her behavior of "playing with [her] hair, taking [her] glasses on and off, shuffling [her] papers, [and] scraping out [her] fingernails" were "games" and part of her "playbook"; maintained that Frenchko had criticized others for not coming to work or not parking in the correct locations, when Frenchko herself did not come to work and parked in designated handicapped spaces. During these comments, Shook made references to Frenchko's attendance at events outside of the commissioners' meetings.

{¶20} During her testimony, Frenchko maintained that Shook's comments at the commissioners' meetings were unrelated to county business, and she believed Shook's intent was to intimidate her and to demonstrate to her that he was tracking her whereabouts. Further, Frenchko maintained that Shook obtained some of the information related to her location from her personal Facebook page, which she had blocked him from viewing.

9

{¶21} However, Shook maintained that his comments were related to Frenchko's use of the handicapped parking spaces and her failure to attend workshops or training that had been scheduled for the commissioners. Specifically, Shook referenced Frenchko dancing at a festival in support of his position that it was unnecessary for Frenchko to utilize handicapped parking spaces. Shook acknowledged that he had multiple Facebook accounts, and he was able to view Frenchko's public posts on her personal page using a different account than the one Frenchko had blocked. He also acknowledged that much of his information as to Frenchko's whereabouts was available from groups and other individuals on Facebook.

{¶22} In a video of a portion of the commissioners' meeting held on November 15, 2023, the day after Frenchko filed her petition for a CSPO, but prior to the issuance of the ex parte order, Shook placed a sign on the dais in front of Frenchko's phone, which was recording the audience while the commissioners exited the room to go into executive session. The sign blocked the video recording until Frenchko removed it.

{¶23} In addition to the evidence regarding Shook's comments and conduct at the commissioners' meetings, evidence was presented as to two other functions at which Frenchko and Shook were both present—a county GOP petition signing event and a Warren City Council meeting.

{¶24} With respect to the GOP event, Shook arrived at the event approximately one to two hours prior to Frenchko. Frenchko maintained that when she arrived at the event, Shook "lurk[ed]" wherever she went and stared at her; although other evidence indicated that Shook remained standing or sitting behind the county GOP secretary. A witness for Frenchko who had attended the event with her maintained that Shook was the

10

only member of the public that she observed remaining in a singular location during the event. Frenchko's witness testified that, although other individuals were taking photographs during the event, the county GOP chairperson informed Frenchko that she needed to stop photographing or leave. Thereafter, the GOP secretary called police officers at the direction of the chairperson, and, after the secretary indicated that the officers were on their way, Frenchko walked to the parking lot. Frenchko testified that she was unaware whether Shook remained at the event after she left, and she acknowledged that she had no evidence indicating that Shook was aware in advance of his arrival that she would be present at the event. However, Frenchko maintained that a reasonable person would have assumed she would be present.

{¶25} With respect to the Warren City Council meeting, Frenchko testified that she was present at the council meeting held on November 8, 2023, and Shook was also present at the meeting, although he was not a resident of the city. Shook did not speak at the meeting, and Frenchko testified that she believed he was there for no reason other than to follow and intimidate her. After the meeting, Frenchko waited for Shook to leave the meeting before her, but, as she was exiting the building, she observed Shook speaking to another individual outside of his car, which was parked across from Frenchko's car. Frenchko asked an officer to accompany her, and the officer agreed to observe from outside the building's door until she left. Frenchko walked to her car, but she maintained that she waited outside of her car door because she wanted Shook to leave prior to her. When the individual with whom Shook had been speaking walked away from him, that individual then stopped to speak to Frenchko, and Shook entered his car.

Case No. 2024-T-0003

Frenchko maintained that Shook then drove slowly through the parking lot and exited. Due to her concern regarding Shook's behavior, Frenchko took an alternate route home.

{¶26} During Shook's testimony, he maintained that he attended the November 8, 2023 council meeting because he planned to speak regarding pay raises. However, Shook was unaware that he was required to complete certain paperwork and to be a city resident in order to comment. Shook provided the paperwork that must be completed to be able to speak at a Warren City Council meeting as an exhibit. Further, Shook called a witness who had been present at a Warren City Council meeting which Shook attended prior to the November 8, 2023 meeting. This witness testified that Frenchko was not present at this prior meeting.

{¶27} Based on the above evidence, following the full hearing, the trial court determined that Frenchko failed to meet her burden of demonstrating by a preponderance of the evidence that Shook engaged in the type of conduct proscribed by the menacing by stalking statute. Within its findings of fact and conclusions of law, the trial court noted the lack of civility currently present in political discourse and advised Shook to not engage in behavior that could be considered menacing by stalking. However, the trial court specifically noted Frenchko had failed to prove in this case that Shook "stepped over the line" from engaging in political discourse to menacing by stalking. The court noted that Shook had not approached or threatened Frenchko, the parties were present at public events, and there was no evidence of Shook following Frenchko to ascertain her whereabouts.

{¶28} After our review, we cannot say the evidence weighed heavily in support of finding that Shook, by engaging in the conduct described above in the latter half of 2023,

12

knowingly caused Frenchko's fear of physical harm or mental distress. Thus, the trial court's denial of the CSPO was not against the manifest weight of the evidence.

{¶29} Accordingly, Frenchko's sole assigned error lacks merit. Consequently, the judgment of the trial court is affirmed.

MARY JANE TRAPP, J.,

ROBERT J. PATTON, J.,

concur.